**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Glen MURPHREE (85–5382), Robert**
**Murphree (85–5383),**
**Defendants-Appellants.**

**Nos. 85–5382, 85–5383.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 9, 1985.

Decided Feb. 4, 1986.

Rehearing and Rehearing En Banc
Denied March 26, 1986.

---

Russell C. Winston argued, Edward C. Duke (LEAD) argued, Federal Public Defender, Memphis, Tenn., for defendants-appellants.

W. Hickman Ewing, Jr., U.S. Atty., Memphis, Tenn., Colleen Schmidt argued, for plaintiff-appellee.

Stephen P. Halbrook, Fairfax, Va., for amicus curiae.

Before ENGEL and MILBURN, Circuit Judges; and WOODS, District Judge.*

* The Honorable George E. Woods, United States District Judge for the Eastern District of Michigan, sitting by designation.

WOODS, District Judge.

These cases are criminal convictions of father and son for importing switchblades contrary to law and federal regulation. Appellants claim that the Switchblade Knife Act (15 U.S.C. § 1241 *et seq.*) is vague and overbroad and thereby unconstitutional; that there was not sufficient evidence beyond a reasonable doubt to support the jury verdict on Counts 4, 6 and 8; and that the trial court committed reversible error by charging the jury with certain parts of the Custom Service Regulations and failing to charge other allegedly relevant parts. For the reasons set forth below, we affirm the trial court.

## I.

Defendants were acquitted of charges of conspiring to introduce switchblade knives into commerce and of doing so in violation of the Switchblade Knife Act, and also of conspiring to import knives contrary to law. They were convicted of three counts of knowingly and fraudulently importing merchandise contrary to law and federal regulation. The regulation involved makes it illegal to import switchblade knives except as permitted by the Switchblade Knife Act. 19 C.F.R. § 12.97. The counts on which they were convicted involved three different packages, each containing 20–30 knives, which were imported on or about May 7 and May 14.

The knives in question, all shipped from Germany, had thumb pulls, a general purpose blade and did not open automatically when seized. They also had, however, a hollow which had been milled out of a portion of the body of the knife into which a spring could be fitted easily. One of the government's witnesses inserted a spring in two minutes, and testified that the knife was of a type manufactured and known as a switchblade knife. He also testified that there was no reason for the hollow other than the insertion of a spring.

Earlier packages of similar knives had been seized and defendants notified of the illegality of such importations in November, 1982, and January, 1983. Those seized in January had not contained springs, yet there is testimony that defendant Glen Murphree had referred to those knives as switchblade knives. Upon being confronted with the knives seized in May, 1984, defendant Robert Murphree stated that the knives were his, that he had ordered them, but that he did not order any switchblade knives.

## II.

We will examine first the failure of the trial judge to charge a portion of the allegedly relevant sections of the Custom Service Regulations while charging others. The sections which were charged over defendants' objections were 19 C.F.R. § 12.-95(a)(2) and (b). The Court also charged § 12.95(a)(1) and (c), but failed to charge § 12.96(a) as requested by defendants. The relevant portions are as follows:

Switchblade Knives

§ 12.95 Definitions

Terms as used in §§ 12.96 through 12.103 of this part are defined as follows:

(a) Switchblade knife. "Switchblade knife" means any imported knife which has:

(1) A blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, or any knife with a blade which opens automatically by operation of inertia, gravity, or both; or

(2) A stiletto or other blade style which is designed for purposes that include a primary use as a weapon when, by insignificant preliminary preparation, as described in paragraph (b) of this section such stiletto or other weapon can be altered or converted so as to open automatically by operation of inertia, gravity, or both. . . .

(b) Insignificant preliminary preparation. "Insignificant preliminary preparation" means preparation with the use of ordinarily available tools, instruments, devices, and materials by one having no special manual training

or skill for the purpose of modifying blade heels, relieving binding parts, altering spring restraints, or making similar minor alterations which can be accomplished in a relatively short period of time.

(c) Utilitarian use. "Utilitarian use" includes but is not necessarily limited to use:

(1) For a customary household purpose;

(2) For usual personal convenience, including grooming;

(3) In the practice of a profession, trade, or commercial or employment activity;

(4) In the performance of a craft or hobby;

(5) In the course of such outdoor pursuits as hunting and fishing; and

(6) In scouting activities.

§ 12.96  Imports unrestricted under the Act.

(a) Common and special purpose knives. Imported knives with a blade style designed for a primary utilitarin use, as defined in § 12.95(c), shall be admitted to unrestricted entry provided that in condition as entered the imported knife is not a switchblade knife as defined in § 12.95(a)(1). Among admissible common and special purpose knives are jackknives and similar standard pocketknives, special purpose knives, scout knives, and other knives equipped with one or more blades of such single edge nonweapon styles as clip, skinner, pruner, sheep foot, spey, coping, razor, pen, and cuticle.

The definitions of switchblade knife are based, first, on the Switchblade Knife Act [§ 12.95(a)(1) ] and, second, on the first and only case cited by either side to interpret the statute, *Precise Imports Corp. and Others v. Joseph P. Kelly*, 378 F.2d 1014 (2d Cir.1967), which is specifically referenced as the source of § 12.95(a)(2) in the last part of the section (which was not included in the charge).

*Precise Imports* noted that "The congressional purpose of aiding the enforcement of state laws against switchblade knives and of barring them from interstate commerce could be easily frustrated if knives which can be quickly and easily made into switchblade knives, and one of whose primary uses is as weapons, could be freely shipped in interstate commerce and converted into switchblade knives upon arrival at the state of destination. We decline to construe the act as permitting such facile evasion." *Precise Imports* at 1017.

■ Therefore, there is little doubt that the sections charged over defendants' objections are in accord with the statute and its intent as interpreted in case law, and that there was no error in so charging. In fact, the regulation omits the language in *Precise Imports* that says that a knife can be found to be a knife within the meaning of the Switchblade Knife Act if it "can be made to open automatically by hand pressure ... after insignificant alterations." Since including this language would favor appellee, its omission from the charge cannot be detrimental to appellants.

The issue, then, is whether the omission of § 12.96(a) defining imports unrestricted under the Act was error. Apparently the Act referred to in the title of this section is the Switchblade Knife Act. This section of the regulations goes considerably beyond anything found in the statute or in any case law mentioned by either appellants or appellee. If that interpretation is binding on the courts, this section should have been included. Since it refers to the condition of the knives "as entered" without regard to the effect of any "insignificant alterations," and since they indisputably did not open automatically at that time, the case would have had a different result of necessity had that section of the regulation been given. It is essential then to determine the efficacy of this section of the regulation.

■ As far as we can tell, this is a question of first impression. The government's brief and the notes to 19 C.F.R. Chapter 12 cite the authority for these reg-

ulations as 19 U.S.C. § 66 and § 1624. These are set out below:

§ 66. Rules and forms prescribed by Secretary

The Secretary of the Treasury shall prescribe forms of entries, oaths, bonds, and other papers, and rules and regulations not inconsistent with law, to be used in carrying out the provisions of law relating to raising revenue from imports, or to duties on imports, or to warehousing, and shall give such directions to customs officers and prescribe such rules and forms to be observed by them as may be necessary for the proper execution of the law.

§ 1624. General regulations

In addition to the specific powers conferred by this chapter the Secretary of the Treasury is authorized to make such rules and regulations as may be necessary to carry out the provisions of this chapter.

The first of these provisions is clearly limited to "provisions of law relating to raising revenue from imports, or to duties on imports, or to warehousing"—none of which are in issue here. The second is limited to regulations necessary to carry out the provisions of "this chapter"—clearly the Tariff Act, as the government acknowledges. It is certainly within the authority of those enabling statutes to specify those laws which designate items which cannot be imported (e.g. 19 C.F.R. § 12.97). The issue, however, is not whether it was within the authority of the Secretary of the Treasury to promulgate these regulations, but rather whether they define for the courts, in this instance, what is contrary to law under 18 U.S.C. § 545 and 19 C.F.R. § 12.97. See, *Chrysler Corp. v. Brown*, 441 U.S. 281, 309 n. 40, 99 S.Ct. 1705, 1721 n. 40, 60 L.Ed.2d 208 (1979).

■ In order to do so they must be a "substantive rule" or a "legislative-type rule" as described by the Supreme Court in *Chrysler* 441 U.S. at 301–03, 99 S.Ct. at 1717–18. Such rules must affect individual rights and obligations, be rooted in a grant of quasi-legislative authority by Congress

and subject to congressional limitations, and conform with any procedural requirements imposed. *Id.* Since there has been no argument presented that procedural requirements for substantive rules were not complied with, we assume that they were. Likewise, it is clear that these rules, if used as appellants would have us use them, would affect individual rights and obligations. Therefore, the only issue is whether the use they propose of the regulations was reasonably within the contemplation of the grant of authority made by Congress. See *Chrysler* at 303–06, 99 S.Ct. at 1718–20.

■ We have not been provided by any of the parties to this appeal with any legislative history of any of the statutes involved in this issue. It is clear, however, that the Secretary of the Treasury was not given, and these regulations were not issued pursuant to, a grant of authority to promulgate regulations under 18 U.S.C. § 545 or the Switchblade Knife Act. The authority given relates to the specific functions discussed above and to the implementation of the Tariff Act. While Congress certainly must have contemplated that the Treasury Secretary would have the need to define articles for the purpose of administering that Act, including knives (especially since knives are included in a section of that Act as one of a variety of items whose importation is controlled and taxed, see 16 U.S.C. § 1202, Schedule 6, Part 3, and especially 649.57 *et seq.* and 649.67), the issue in this case is not one arising under the Tariff Act, but a criminal action. It seems unlikely that Congress contemplated that this grant of authority would give the Secretary of the Treasury authority in this context to promulgate regulations with the force and effect of law (as they would have were they legislative regulations, *Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977)). As the *Chrysler* court stated: "But the thread between these regulations and any grant of authority by the Congress is so strained that it would do violence to established principles of separation of pow-

ers to denominate these particular regulations 'legislative' and credit them with the 'binding effect of law.' *Chrysler*, 441 U.S. at 307–08, 99 S.Ct. at 1720–21.

 To determine that the regulations are not legislative rules in this context does not mean that they are without effect on the courts. The still-authoritative opinion of the Supreme Court in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1940), on the effect of interpretative rulings by agencies is:

> We consider that the rulings, interpretations and opinions of the Administrator under this Act [the Fair Labor Standards Act], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

 As developed above, to have required the trial court to include this section of the regulations would have effectively vitiated the rationale of *Precise Imports*, as applied to this case. Since we find that reasoning persuasive, it follows that we do not find persuasive any reasoning which would dictate an opposite result—especially when we have been provided with no explanation of the Secretary's reasoning, or whether this type of situation was envisioned during the development of the regulations.

We hold, therefore, that the charge as given was an adequate statement of the law to be applied to these defendants and that any error favored defendants rather than the government.

### III.

We find appellants' other arguments to be without merit. Given these instructions

there was ample evidence presented by the government which, if believed by the jury, supports their verdict beyond a reasonable doubt. Likewise we do not find this statute to be vague and overbroad either as applied to appellants or facially. We therefore AFFIRM the trial court.